IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

QUINTIN PHILLIPPE JONES,          §
     *Plaintiff,*          §
               §     No. 4:21-cv-01641
               §     Hon. George C. Hanks, Jr.
DAVID GUTIERREZ, et al.,          §     **DEATH PENALTY CASE**
     *Defendants.*          §

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF
JONES'S EMERGENCY MOTION FOR STAY OF EXECUTION**

Plaintiff Quintin Jones was convicted and sentenced to death in 2001 for the murder of Berthena Bryant, his elderly great-aunt, in the course of committing robbery. He is scheduled to be executed after **6:00 p.m. (Central Time) on Wednesday, May 19, 2021**. Jones has challenged his conviction and death sentence in both state and federal court. His claims have been rejected in each instance.

On the day of his execution Jones filed a Complaint Filed under 42 U.S.C. § 1983, ECF No. 1, an Emergency Motion for Stay of Execution, ECF No. 3, and a Motion for Resolution of the Motion for Stay of Execution on an Expedited Basis, ECF No. 5. Jones seeks a stay of May 19th execution date, so that he can challenge the process by which the Texas Board of Pardons and Paroles failed to recommend commutation of his sentence to the Governor, arguing that it "raises the strong presumption that its decision was tainted by racial discrimination." ECF No. 3, at 1. Jones relies solely on the fact that the

1

Board recommended clemency to Thomas Whitaker, who is white, but denied clemency to Jones, who is black, despite the fact that, in both cases, the victim's family is also the defendant's family and the surviving family forgives the defendant. ECF No. 3, at 3-4.

Jones's motion clearly fails to make the case for any stay and is instead only a meritless tactic to delay imposition of his well-deserved sentence. *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005) (it is no secret that "capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of a sentence of death.").

A stay of execution is an equitable remedy and, as such, it "must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649–650 (2004)). Jones's state and federal collateral proceedings have long run their course in the many years since he was sentenced to death. The State has a compelling interest in seeing that its laws are enforced and in carrying out executions as scheduled. Further unnecessary delay hinders that interest.

Such is especially true where, as here, Jones cannot succeed on his claims because Jones fails to demonstrate a valid basis for relief. Supreme Court precedent makes clear that clemency is the prerogative of the executive branch, and not the business of the judiciary. Texas' procedures are completely

2

acceptable under the Supreme Court's minimal standards governing clemency proceedings. And Jones's equal protection claim is wholly speculative and conclusory. Jones provides no direct evidence that any member of the Board acted with racial animus and only infers discrimination based on the disparate treatment in Whitaker's case. But Jones's case is easily distinguishable from Whitaker's, as demonstrated below.

Jones has the burden of persuasion on his stay request, and he is required to make "a clear showing" that he is entitled to one. *Hill*, 547 U.S. at 584. Jones abjectly fails to make that showing. Accordingly, Jones's motion for a stay should be denied.

## STATEMENT OF THE CASE

### I.     Facts Concerning the Guilt-Innocence Stage.

The Texas Court of Criminal Appeals (CCA) summarized the facts of the case as follows:

> The victim was [Jones]'s eighty-three-year-old great-aunt, Berthena Bryant. Despite her income of less than $500.00 a month, Bryant occasionally made small loans to various people, including [Jones], and she kept a ledger recording the loans and their repayments. On September 10, 1999, Bryant told her sister, Mattie Long, that she had refused [Jones]'s request for a loan earlier in the day. Long testified that Bryant seemed uneasy about her conversation with [Jones]. The next morning, Bryant's body was discovered in her home by neighbors. A bloody, broken baseball bat was recovered at the scene. Bryant's car was located a half mile from her house and her purse and wallet were found in the car. The medical examiner, Dan Konzelman, testified to the existence of defensive bruising on Bryant's wrists and arms.

Konzelman also described Bryant's various abrasions, bruises, and fractures, which included a broken collarbone and shoulder blade, two fractured ribs, and a fracture at the base of the skull.

[Jones] was arrested for outstanding traffic warrants and for possession of a controlled substance on the same day that Bryant's body was discovered. While in custody, [Jones] was questioned twice about Bryant's murder by Detective Ann Gates. The first interview took place on the day he was arrested. Gates read [Jones] his Miranda warnings when she noticed that [Jones] had no reaction to the news of Bryant's death. [Jones] gave a statement denying any involvement in Bryant's murder and claiming an alibi. The next day, after being informed of his rights again, [Jones] accompanied Gates to various locations in an effort to corroborate his alibi. That same day he took a polygraph examination.

When [Jones]'s alibi information did not check out and the polygraph indicated deception, Gates interviewed [Jones] a second time. Gates again read [Jones] his Miranda rights, [Jones] agreed to waive them, and [Jones] gave a second written statement (the "Gates statement"). In the Gates statement [Jones] stated that he had "another personality" named James who lived in his head. He stated that James had started living in his head since age ten or eleven when he was molested by his brother and cousin. [Jones] stated that James went to Bryant's house to steal some money. After Bryant let him in and James could not find her purse, [Jones] stated that James lost his temper and started hitting Bryant with a bat she kept by the door. After that, James found Bryant's purse and left in Bryant's car. [Jones] stated there was $30.00 in Bryant's purse. [Jones] then went to a friend's house and bought drugs with the money. He later left Bryant's car in a parking lot.

*Jones v. State*, 119 S.W.3d 766, 770–71 (Tex. Crim. App. 2003).

## II.    Facts Concerning Punishment and Sentencing.

### A.    The State's case for future dangerousness

In addition to the heinous nature of the crime, the jury heard a considerable amount of evidence at the punishment phase concerning Jones's

violent disposition and potential for future dangerousness. Jones had been convicted of several violent offenses before he became an adult, including an assault of two teachers, possession of a handgun, and an assault of another student by setting her hair on fire. 33 RR 55–69, 77–88; 34 RR 12, 79–81. Mark Turner, one of the teachers assaulted by Jones, described Jones as "just going crazy, just punching and biting and snarling . . . like the Tasmanian Devil," and explained that it took five male teachers and a police officer to restrain and handcuff Jones. 33 RR 77–88. Jones had also been placed on probation for assaulting someone as a gang initiation, and substantial evidence was introduced about his numerous gang tattoos and membership in the Hoova Crips gang. 34 RR 28–42.

Evidence was also presented concerning Jones's participation in the unrelated murders of two other individuals—Marc Sanders and Clark Peoples. John Williams, the fourteen-year-old son of Jones's girlfriend, Paula Freeman, testified that Jones had lived with them for several years.  34 RR 47–62. Williams testified that one day while his mother was at work, Jones told him to leave the house because Jones and his friend "Red" might do something that would land them in prison. *Id*. at 47, 54. Williams took his little brother to a friend's house a block away. *Id*. at 55.  When he returned home about an hour later, Williams found blood stains on the walls and on the carpet by the couch in the living room. *Id*. at 57–58. Although no one was home when he returned,

5

it appeared as though someone had tried to clean the stains out of the carpet. *Id*. at 56–58. Greg Hilbeig, a criminologist with the DPS crime lab, later corroborated William's testimony by testifying that the stains found on the walls, carpet, and couch of the Freeman residence were human blood. *Id*. at 168–78.

David Walker, a captain with the Wise County Sheriff's Department, testified about the investigation into the Sanders/Peoples murders. *Id*. at 66–97. After investigating the case for several months and getting very few leads, a break in the case happened when Detective Gates informed him that Jones's sister, Keisha Jones, may have some information about the murders. *Id*. at 94–95. After speaking with Keisha, Walker began preparing an arrest warrant for Ricky "Red" Roosa, while another investigator working on the case, Texas Ranger Lane Akin, began working on a search warrant for Jones's residence. *Id*. at 96, 128. On the morning of September 22, 1999, Ranger Akin and other officers executed a search of Jones's residence. *Id*. at 131–33. Ranger Akin then left the house about an hour later to go interview Jones, who was already in custody at the time for the instant offense. *Id*. at 134–35. When he arrived at the jail, Ranger Akin informed Jones that he was investigating the Sanders/Peoples murders, but Jones denied having any involvement at that point. *Id*. at 137–38. However, after Ranger Akin told Jones that "Red" had

already placed the blame on him, Jones gave the following confession, which

Ranger Akin read to the jury:

> Me and Red were heading to my house; his car broke. We walked
> to my house. Red asked if I knew someone with money. We had
> done some business with Little Boo. I beeped Little Boo, Clark
> Peoples. Red said he was going to hide behind the door. I was
> hoping that Little Boo was by himself, but Marc Sanders was with
> him. Little Boo walked in by himself. Marc stayed in the car; a
> smoked gray Altima. When Little Boo walked in, Red, Ricky, hit
> him, Little Boo, with a barbell. He hit him more than three times.
> Little Boo was hollering. He fell to the floor. Red told me to grab
> him and hold him. I held Little Boo down while Red choked him
> with his hands. Red starting hitting Little Boo harder and harder.
> Red was hyped from this shit. Red told me to bring a belt to tie
> Little Boo. I took a braided leather belt out of my pants. Red tied
> Little Boo with the belt. Red told me to help move Little Boo out of
> sight. We moved Little Boo in the back room. Little Boo was
> wearing some white shoes, blue Dickey pants, and a sky blue shirt.
> Red told me to holler at Marc and have him come, I did. Marc came
> in the house and Red hit him in the head with a barbell. Red was
> mad because it took Marc a long time to give up. Red kept on
> hitting Marc until he fell. Red took the barbell and pushed it down
> against Marc's neck. He told me to bring something to tie Marc up
> with. I brought him a white extension cord. We tied him up. Red
> told me to drive around back in Little Boo's car, and I did. I opened
> the trunk. We put Little Boo in the truck. Red opened the back
> door and we tried putting Marc in the backseat. Marc was heavy
> but we got him in there. We went in the house and cleaned up.
> Marc had a necklace, a rope, gold, Marc had a ring, gold, and a
> pager. Clark had two or three rings. One of them was gold and the
> other was diamond and gold. Clark had a gold and diamond cross
> necklace. Clark had a pager. They had two or three hundred
> dollars or a little bit more. They had two hundred dollars or more
> in crack cocaine. After they were loaded into the car Red said he
> knew a place, and he told me to drive. I drove through Lake Worth
> and we drove to a river. They had a van there, so I didn't know the
> neighborhood and so Red drove. We drove around getting high.
> Then we came back and basically we pushed them down a hill into
> the river. I think there was a bridge close by. I walked in the water

and pushed them a little farther Then he drove to the other side where there was a trail. We dumped everything in the river, towels, clothes and the barbell. After we dumped all that in the river, he drove to a friend's house. He told me to stay in the car. It was like a trailer-type home in the area. He came back out and then we headed to the store and bought some cleaning stuff. It was like dusk. It was a hardware-type store.  We drove to some apartments in the area. We cleaned out the car. We walked to a friend's house. We had waited on someone else but they never came, so we paid this other friend to drove us back to Fort Worth. He was kind of big and he had a white or gray van. He Red, pawned the jewelry in Wise County or Azle or Lake Worth.

34 RR 138–47; SX 133.

The State provided further proof of Jones's participation in the Sanders/Peoples murders through cross-examination of two defense witnesses, Paula Freeman and Keisha Jones. Freeman testified that she found blood stains on the walls and the carpet of her house when she came home on June 5, 1999, but that she did not call the police. *Id*. at 14-15. Instead, she called Jones, who told her that he had been in a fight with his friend. *Id*. at 15. The next time she saw Jones, he asked for money so that he could leave town. *Id*. at 16. Keisha Jones admitted on cross-examination that Jones had talked to her about the Sanders/Peoples murders, and testified that Jones told her that he was talking to Peoples in the living room when Red came from behind and hit Peoples over the head with a barbell. *Id*. at 91. According to Keisha, Red then told Jones to "finish what he started" or else he would hurt Freeman and her sons. *Id*. at 91, 94. Keisha stated that she had not mentioned this threat to

Ranger Akin when she gave her original statement because the police scared her. *Id*. at 92. Although she had also told the Rangers that Sanders was forced to sit on the couch and watch while they killed Peoples, Keisha testified that she was "mistaken" and later learned from Paula Freeman that Sanders had remained in the car while Peoples was being bludgeoned to death, and that Jones later went out to retrieve Sanders from the car. *Id*. at 96–100. She was also "mistaken" when she told the Rangers that Jones and Red had committed the murders for money, jewelry, and crack, and explained that these things were only taken after the fact. *Id*. at 97–98.

## B.   Evidence presented by the defense in mitigation

In his defense, Jones called Paula Freeman to testify on his behalf. Freeman stated that she and her children had lived with Jones about three or four years and that they considered Jones to be just a like a father. 34 RR 208. Although Jones had a drug problem, he tried to keep that away from her and her children. 35 RR 6–7. Freeman stated that Jones was trying to stay away from the gang and out of trouble, but that he was heavily influenced by Red. *Id*. at 11–12. According to her, all of the things Jones had done wrong were because of Red's influence, and he would not have been where he is now had it not been for Red. *Id*. Freeman stated that she and her children all loved Jones, and that he was a "really good person" who just "went the wrong way." *Id*. at 9.

9

On cross-examination, Freeman stated that Jones had never been violent with her or her children, and that the only times Jones had ever been violent in her presence were when he did violence to himself. *Id.* at 19. According to Freeman, Jones would yell at himself in the mirror or hit himself in the head whenever things were not going right for him, and she had witnessed him beat himself up with an iron and burn himself with cigarettes on various occasions. *Id.* at 20–22. When he acted this way, Freeman stated that it was like another personality had taken over in order to protect Jones. *Id.* at 23. She first noticed this new personality—"James"—sometime in 1998, and he only seemed to appear when Jones was stressed out and on drugs. *Id.* at 23–24, 31–32. "James" also never seemed to appear unless Jones was in trouble for something. *Id.* at 32-33.

Jones's sister, Keisha, testified on his behalf at the punishment phase as well. Keisha stated that she and her three siblings, including Jones, hardly ever stayed with their mother because she was a crack addict and that their father treated Jones as if Jones wasn't his child. *Id.* at 51–54. When they did stay with their mother, her stepbrothers would lock themselves in the back room with Keisha and Jones and make them have sex while the stepbrothers watched. *Id.* at 68–69. At that time, she was ten or eleven years old and Jones was seven or eight. *Id.* Keisha then testified that Jones first started using drugs when he was about thirteen, and that she had seen Jones talk to himself

10

and physically abuse himself on several occasions by hitting, burning, or even shooting himself. *Id*. at 70–71. Like Freeman, Keisha blamed Jones's violent behavior on his alter-ego, "James," who she stated would only come around when Jones was on drugs. *Id*. at 74.  She also stated that Jones was a different person before he met Red, and that his drug habit worsened after they started hanging out together. *Id*. at 75–77.

The defense then called Dr. Raymond Finn, a clinical psychologist who interviewed Jones and his family and gave Jones a battery of tests. Dr. Finn testified that in his opinion, Jones probably did not have a "full blown" multiple personality syndrome, but there was evidence of some kind of dissociative process that manifested itself in the form of an alter-ego. *Id*. at 148, 151. He believed that this alter-ego—"James"—was the personality actually responsible for Berthena Bryant's murder and that Jones had little or no ability to control James's violent tendencies. *Id*. at 157. Dr. Finn testified that he thought Jones was very remorseful for what he had done, and that he could "work through" his problems through psychotherapy and by refraining from using drugs. *Id*. at 161-62. According to Dr. Finn, Jones had only a moderate to low risk for future violence. *Id*. at 163.

### C.    The State's rebuttal case

In rebuttal, the State called their own clinical psychologist, Dr. Randall Price, who had interviewed and evaluated Jones. Dr. Price testified that he did

not believe that Jones had a mental disorder, and was skeptical that the dissociative identity disorder discussed by Dr. Finn even exists. 36 RR 31–50. He was also very skeptical of the existence of "James," as the fact that he only appears when Jones is on drugs or in some kind of trouble indicates that he is using this identity to avoid responsibility. *Id*. at 53–56. Dr. Price agrees that Jones does have a personality disorder—among other things, the fact that he has little or no conscious and fails to accept responsibility indicate that he is a psychopath. *Id*. at 57–90. But according to Dr. Price, Jones's violent tendencies were not a product of an abusive or neglectful childhood, but rather are more likely caused by Jones's drug addiction and the fact that he is a psychopath. *Id*. In his opinion, the results of a variety of tests he administered to Jones indicate there is a significant probability that Jones will commit violent acts in the future, no matter where he is located. *Id*. at 90.

## III.   Procedural History

The Fifth Circuit Court of Appeals summarized Jones's case history as follows:

> Jones was convicted by a Texas jury of capital murder and sentenced to die. [*Jones v. State*, 119 S.W.3d 766, 770 (Tex. Crim. App. 2003).] The [CCA] affirmed his conviction and sentence. [*Id*.] The United States Supreme Court denied certiorari. [*Jones v. Texas*, 542 U.S. 905 (2004).] Jones then filed a state petition for habeas corpus, which the [CCA] denied. [*Ex parte Jones*, No. WR–57,299–01, 2005 WL 2220030 (Tex. Crim. App. Sept. 14, 2005).]

Jones filed a federal petition for habeas corpus in the Northern District of Texas. [*Jones v. Quarterman*, No. 4:05-cv-6384, 2007 WL 2756755 (N.D. Tex. Sept. 21, 2007).] His petition was dismissed as time-barred. [*Id.*] The district court appointed new counsel and vacated its dismissal to give Jones a chance to respond. [*Jones v. Quarterman*, No. 4:05-cv-6384, 2008 WL 4166850 (N.D. Tex. Sept. 10, 2008); *see Jones v. Quarterman*, No. 4:05-cv-638, ECF Nos. 31, 43.] After his response, his petition was again dismissed as time-barred. [*Jones v. Quarterman*, No. 4:05-cv-638, 2009 WL 559959 (N.D. Tex. June 17, 2010).] Jones appealed, and we vacated and remanded for reconsideration in light of the principles of equitable tolling announced in the Supreme Court's then-recent decision *Holland v. Florida*[, 560 U.S. 631 (2010)]. [*Jones v. Thaler*, 383 F.App'x 380, 380 (5th Cir. 2010) (unpublished).] On remand, the district court found that no grounds existed for equitable tolling and once again dismissed Jones's federal habeas petition as time-barred. [*Jones v. Stephens*, No. 4:05-cv-638, 2013 WL 4223968 (N.D. Tex. Aug. 15, 2013).] Then on Jones's motion to alter judgment, the district court reversed course, persuaded that equitable tolling relieved Jones's petition from the AEDPA limitations bar. [*Jones v. Stephens*, 998 F.Supp.2d 529 (N.D. Tex. 2014).] It granted leave to file an amended petition for federal habeas with additional briefing by both parties. [*Id.*]

*Jones v. Davis*, 673 F. App'x 369, 371 (5th Cir. 2016) (footnotes replaced by citations).

Following that briefing, the district court denied Jones's federal habeas petition and a certificate of appealability (COA). *Jones v. Stephens*, 157 F. Supp.3d 623 (N.D. Tex. 2016). The Fifth Circuit granted a COA on one of two issues raised by Jones—his claim that his confession was erroneously admitted at sentencing—and the district court's denial of investigative funding, but ultimately the court affirmed the district court's denial and again on petition

13

for rehearing and rehearing en banc. *Jones v. Davis*, 673 F. App'x at 376; *Jones v. Davis*, 922 F.3d 271 (5th Cir. 2019); *Jones v. Davis*, 927 F.3d 365 (5th Cir. 2019). This Court denied Jones's petition for certiorari for both his appeal of the Fifth Circuit's partial denial of a COA and its affirmance of the district court's denial of relief. *Jones v. Davis*, -- U.S. --, 137 S. Ct. 2188 (2017); *Jones v Davis*, -- U.S. --, 140 S. Ct. 2519 (2020).

On November 18, 2020, the Criminal District Court No. 1 of Tarrant County entered an order setting Jones's execution date for May 19, 2021. On April 19, 2021, Jones sought to intervene and moved for a stay of execution in *Busby v. Collier*, et al., No. 4:21-cv-00297 (N.D. Tex.) on the basis of his denied request for a spiritual advisor to be present in the execution chamber. ECF Nos. 31, 32. But he moved for voluntary dismissal on May 12, 2021, after the Texas Department of Criminal Justice – Correctional Institution Division (TDCJ) approved his spiritual advisor to be present. ECF No. 46. The district court granted Jones's motion. ECF No. 47.

While those motions were pending, Jones filed a second state habeas application for writ of habeas corpus; the CCA dismissed that application as an abuse of the writ under Texas Code of Criminal Procedure art. 11.071 § 5. Pet. Cert. App. 001–002 (*Ex parte Jones*, No. WR-57,299-02 (Tex. Crim. App. May 12, 2021)).

On May 17, 2021, Jones filed in the Fifth Circuit a motion for authorization to file a successive petition and motion to stay his execution. The Fifth Circuit denied his motions on May 18, 2021. *In re Jones,* No. 21-10507. Also on May 17, 2021, Jones filed in the Supreme Court a petition for certiorari and an application for a stay of execution. That petition is still pending.

## ARGUMENT

### I.  Jones Is Not Entitled to a Stay of Execution.

#### A.  Standard of review

A stay of execution is an equitable remedy. *Hill*, 547 U.S. at 584. "It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id. (*citing *Nelson*, 541 U.S. at 649–50). "It is well-established that petitioners on death row must show a "reasonable probability" that the underlying issue is "sufficiently meritorious" to warrant a stay and that failure to grant the stay would result in "irreparable harm." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983), superseded on other grounds by 28 U.S.C. § 2253(c)(2). Indeed, "[a]pplications for stays of death sentences are expected to contain the information and materials necessary to make a careful assessment of the merits of the issue and so reliably to determine whether plenary review and a stay are warranted." *Id.* To demonstrate an entitlement to a stay, a petitioner must demonstrate more than "the absence of frivolity" or

"good faith" on the part of petitioner. *Id*. at 892–93. Rather, the petitioner must make a substantial showing of the denial of a federal right. *Id*. In a capital case, a court may properly consider the nature of the penalty in deciding whether to grant a stay, but "the severity of the penalty does not in itself suffice." *Id*. at 893. The State's "powerful and legitimate interest in punishing the guilty," as well as its interest in finality, must also be considered, especially in a case such as this where the State and victims have for years borne the "significant costs of federal habeas review." *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (both the State and the victims of crime have an important interest in the timely enforcement of a sentence).

Thus, in deciding whether to grant a stay of execution, the Court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Buxton v. Collins*, 925 F.2d 816, 819 (5th Cir. 1991).

**B.     Jones has not made a strong showing that he will succeed on the merits.**

Given the legally and factually deficient nature of his claim for relief, Jones fails to show that there is any significant possibility that he will succeed on the merits. Jones's failure to offer a sound claim for relief therefore supports the denial of a stay of execution.

**1.     Texas's clemency procedures meet the Supreme Court's due-process requirements.**

"[P]ardon and commutation decisions are rarely, if ever, appropriate subjects for judicial review." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998) (Rehnquist, J.C., with three justices joining and four justices concurring in result) (citing *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). Due process is not violated where the clemency procedures do no more than confirm that clemency powers are committed, "as is our tradition," to the authority of the executive. *Id*. An inmate has no substantive expectation of clemency. *Id*. at 283. "[C]lemency [is] a prerogative granted to executive authorities . . . . It is not for the Judicial Branch to determine the standards for this discretion." *Cavazos v. Smith*, 565 U.S. 1, 9 (2011). "If the clemency power is exercised in either too generous or too stingy a way, that calls for political correctives, not judicial intervention." *Id*. Clemency proceedings involve no "objective factfinding." *Dumschat*, 452 U.S. at 464

17

(addressing commutation and parole issues). The decisions also involve "purely subjective evaluations and predications on future behavior." *Id*. Such matters involve not questions of fairness but of grace.

Nevertheless, although four justices of the Supreme Court found a death-sentenced inmate's life interest to be insufficient to warrant due process protection, a majority of the Court has found that such an inmate has not been deprived of all of his life interest. *Woodard*, 523 U.S. at 289. Thus, in her concurring *Woodard* opinion, in which she was joined by three other justices,[1] Justice O'Connor stated that "some *minimal* procedural safeguards apply to clemency proceedings." *Id*. (emphasis in original). Those minimal safeguards are not specified, except to cite flipping a coin or arbitrarily denying *any* access to the clemency process as examples of situations warranting judicial intervention. *Id*. Even applying her due process standard, however, Justice O'Connor found that Ohio's clemency procedure, including the notice of hearing and the opportunity to interview, comported with due process. *Id*. at 290.

The Fifth Circuit has also interpreted the due-process requirements in clemency cases narrowly. In *Faulder v. Texas Bd. of Pardons & Paroles*, the

---

[1]    In his dissent, Justice Stevens provided the fifth vote in favor of due process applying to clemency proceedings; however, he would go further than "minimal" procedures.

petitioner argued that the Texas Board of Pardons and Paroles' procedures did not comport with the minimal due-process standard set forth in *Woodard*. 178 F.3d 343, 344 (5th Cir. 1999). The petitioner in *Faulder* claimed that he received inadequate notice of issues that Board would consider and that it acted in secrecy—not holding hearings, not providing reasons for its decisions, and not keeping records. *Id*. The Fifth Circuit rejected the petitioner's arguments, holding that petitioner's clemency experience did not meet the "low threshold of judicial reviewability" mentioned by Justice O'Connor in her "narrow view of judicial intervention." *Id*. The Fifth Circuit noted further:

> Procedural due process is an inherently flexible concept. And [*Woodard*] emphasizes that extra flexibility is require when, as here, the criminal process has reached an end and a highly individualized and merciful decision like executive clemency is at issue.

*Id*. at 345. Thus, the Board's actions complied with the constitutional minimum set forth in *Woodard*.

The Fifth Circuit has consistently applied the Supreme Court's standards to find a lack of due process problems with state clemency procedures. *See Tamayo v. Perry*, 553 F. App'x 395 (5th Cir. 2014); *Turner v. Epps*, 460 F. App'x 322, 331 (5th Cir. 2012) (per curiam); *Roach v. Quarterman*, 220 F. App'x 270, 275 (5th Cir. 2007) (denying a certificate of appealability where Texas procedures "do not resemble flipping a coin" and petitioner failed

to provide evidence that he was denied access to the clemency process or that a clemency decision would be made arbitrarily); *Sepulvado v. La. Bd. of Pardons & Parole*, 171 F. App'x 470, 472–73 (5th Cir. 2006) (per curiam) (holding that petitioner failed to prove that Louisiana's failure to guarantee a clemency hearing violated due process and thus did not meet the "highly deferential *Faulder* standard of review").

The judiciary has a "narrow role in the uniquely executive task of considering clemency[.]" *Tamayo*, 553 F. App'x at 402; *see also Faulder*, 178 F.3d at 344–45; *Moody v. Rodriguez*, 164 F.3d 893 (5th Cir. 1999). To the extent that Texas clemency proceedings are subject to due process guarantees, the procedures meet those guarantees set out by the Supreme Court.

### 2. Jones's equal protection claim is baseless, conclusory, and speculative.

In *Woodard*, the Chief Justice noted that the Court left open the question of whether "a defendant would be entitled to raise an equal protection claim in connection with a clemency decision." 523 U.S. at 276 n.1; *Young v. Gutierrez, et. al,* 895 F.3d 829, 831 n.9 (5th Cir. 2018) (assuming without deciding that defendant can raise equal protection claim in response to clemency decision). But even assuming arguendo that equal protection applies to clemency decisions, Jones abjectly fails to make the case that he was discriminated against on the basis of his race. Jones provides no evidence of racially

20

discriminatory statements made by any member of the Board. There is no discriminatory language in the Board's decision—on the contrary, the Board's policy and members' voting sheets expressly require the Board members to disavow any reliance on race in reaching their decision. *See* Exhibits A and B.

Instead of offering direct evidence of bias, Jones instead points to the commutation of Thomas Whitaker's death sentence on February 22, 2018. Specifically, Jones alleges that he and Whitaker are similarly situated because Whitaker's father, who was also one of Whitaker's victims, forgave Whitaker and opposed the death penalty, and here, the surviving family of Berthena Bryant, also oppose the death penalty for Jones. ECF No. 3 at 6. Jones speculatively argues that the Board's vote in his case "has the appearance of being corrupted by racial discrimination." *Id.* at 3. However, as shown below, Jones's speculative and conclusory allegations are not tenable under the relevant case law.

As explained by the Fifth Circuit:

"[T]he Equal Protection Clause protects individuals from governmental action that works to treat similarly situated individuals differently." *John Corp. v. City of Houston*, 214 F.3d 573, 577 (5th Cir. 2000). In addition, the main purpose of the Equal Protection Clause is to prevent official conduct that discriminates on the basis of race. *Washington v. Davis*, 426 U.S. 229, 239 (1976). "To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that [she] received treatment different from that received by similarly situated individuals and that the unequal treatment

stemmed from a discriminatory intent.'" *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir.2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (per curiam)); *see also Village of Arlington Hts. v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

*Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 227 (5th Cir. 2012).

And, in general, a complaint will not survive a motion to dismiss unless it pleads sufficient facts to allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations stated in the complaint must be enough to "raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. To survive a motion to dismiss, the complaint must provide "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citations and internal quotations omitted).

For instance, in *Bowlby*, the Fifth Circuit noted:

Here, Bowlby's equal protection allegations are as follows: "Plaintiff is a white person. The Defendants have not closed any business of a black person or alleged failure to comply with laws

22

and regulations even though such non-compliance with laws and regulations by black businesses exist." This is insufficient to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). *Bowlby*, 681 F.3d at 227.

In *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987), the Supreme Court held that in order to establish an equal protection violation in the analogous context of prosecutorial discretion[2] in capital sentencing, a defendant must prove that the decisionmakers in his case acted with a discriminatory purpose. *See also White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013) (unpublished) ("A defendant claiming an equal protection violation in a death penalty case must prove that the prosecutor acted with a discriminatory purpose in that particular case."); *Hughes v. Dretke*, 160 F. App'x 431, 436 (5th Cir. 2006) (petitioner presented no direct evidence that conviction obtained as a result of racially discriminatory practice). "Exceptionally clear proof" is therefore required before courts will infer abuse of prosecutorial discretion. *McCleskey*, 481 U.S. at 297.

Jones's proof is not clear or even remotely compelling. "[Jones]'s conclusory assertions that he was treated differently than other similarly

---

[2]    Like clemency decisions, the sound exercise of prosecutorial discretion is a core constitutional function of the executive branch of government, is essential to protecting societal interests in the effective enforcement of criminal law, and is thus ill-suited to judicial review. *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996); *Wayte v. United States*, 470 U.S. 598, 607 (1985)*; United States v. Goodwin*, 457 U.S. 368, 382 (1982).

situated inmates are insufficient to state an equal protection claim." *Clark v. Owens*, 371 F. App'x 553, 554 (5th Cir. 2010) (citing *Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir. 1986)). Whitaker and Jones are not even slightly comparable—Whitaker's case was sui generis. Governor Abbott's proclamation explains at least some of the reasons that clemency was granted in that case. Proclamation by the Governor of Texas, available at https://gov.texas.gov/uploads/files/press/Governor_Abbott_Commutes_Senten ce_Of_Thomas_Whitaker_02222018.pdf (last accessed July 13, 2018); *see also Whitaker v. Davis*, 853 F.3d 253, 255 (5th Cir. 2017). The differences between Jones and Whitaker are striking.

First and most importantly, Whitaker orchestrated the killing of his family for pecuniary gain. *Id*. A man recruited by Whitaker killed Whitaker's mother and brother, but Whitaker's father survived the attempt on his life. *Id*. Despite his son's actions, Whitaker's father forgave his son and opposed his execution. *Id*. By executing his son, the State would have effectively victimized Whitaker's father a second time. Whitaker's father was also a direct victim of Whitaker's crime and was wounded during the killings. Bryant's relatives, while doubtlessly suffering from the loss of their family member, were not themselves attacked by Jones. The unusual facts of Whitaker's case are not repeated here and, in fact, may never be repeated.

Second, the Governor's proclamation clearly notes that Whitaker was not

the triggerman. In contrast, Jones beat his aunt to death with a baseball bat. *See Jones*, 119 S.W.3d at 770–71.

Third, although not mentioned by the Governor's proclamation, Whitaker's criminal history outside of his family's murders and associated actions was minimal. *Whitaker v. Davis*, No. 16–70013 (Appellee's Brief at 22–23). Jones has an extensive criminal history unrelated to Bryant's murder, including the murder of two other men. *See* Statement of the Case, Section II(A), supra.

The comparison of the relative merits of Jones's and Whitaker's clemency cases is inappropriate for this Court to engage in and calls into question the separation of powers. Rightfully, this job belongs to the people's elected executives. But even if the Court wished to compare their clemency cases, Jones's case is far weaker than Whitaker's. And, even so, as described by Justice Sotomayor, "[e]xecutive clemency is fundamentally unpredictable. Clemency officials typically have 'complete discretion' to commute a defendant's sentence based on 'a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations.'" *Holiday v. Stephens*, 136 S. Ct. 387 (2015) (Sotomayor, J., dissenting) (citing *Woodard*, 523 U.S. at 278, 281; Tex. Const., Art. IV, § 11; Tex. Code Crim. Proc. Ann., Art. 48.01 (Vernon Supp. 2014)); *see also Workman v. Summers*, 111 F. App'x 369, 371 (6th Cir. 2004) (stating that a federal court is not authorized to review

the substantive merits of a state clemency proceeding, but rather is authorized to the limited inquiry of determining whether some minimal procedural safeguards existed).

Finally, the Defendants have submitted as exhibits the blank voting sheets that were provided to the Board members in Jones's case and the Board's general policy concerning clemency cases. The policy statement explicitly states that the "[t]he Board shall not discriminate against any applicant because of race, color, disability, sex, religion, age, national origin, or genetic information." Exhibit A. And the blank individual voting sheets provided to the Board members in Jones's clemency explicitly provide that "I further certify that in arriving at my decision in this matter, I did not give prejudicial consideration to the race, color, sex, religion, national origin or political affiliation of the applicant or the victim." Exhibit B. Thus, to find for Jones, the Court would have to necessarily determine that at least four of the six voting Board members were lying when they signed their sheets and actually voted against clemency for Jones because he is an African-American. That is untenable. There is no evidence to support such a finding.

The Fifth Circuit has affirmed a judgment from this district court, dismissing a similar challenge, finding the plaintiff failed to demonstrate a likelihood of success on the merits. The appellate court specifically noted:

[T]he only evidence [the plaintiff] presents in support of his equal

> protection claim is a comparison to one white prisoner whose capital sentence was recently commuted in clemency proceedings. Considering that the state has previously commuted the capital sentences of other African American males, that [the plaintiff] and the white comparator have differing criminal histories, that clemency decisions are predicated on "purely subjective evaluations and predictions on future behavior," and that each Board member's signed vote swore that race was not a consideration, [the plaintiff] has not made a strong showing that if we were to temporarily stay the execution and allow discovery, he would find evidence of discrimination.

*Young,* 895 F.3d at 831-32. Accordingly, Jones cannot show that he is likely to prevail in his civil rights lawsuit challenging the substantive result of the Board's vote. And because Jones cannot show a likelihood of success in his civil rights lawsuit, he is not entitled to injunctive relief.

### C.   Jones is unlikely to suffer irreparable harm.

Jones argues that in his Stay Motion that if this Court does not grant a stay, he will suffer irreparable harm because he will be executed. ECF No. 3 at 6-7. However, this generic assertion is applicable to any execution. In a capital case, a court may properly consider the nature of the penalty in deciding whether to grant a stay, but "the severity of the penalty does not in itself suffice." *Barefoot*, 463 U.S. at 893. Moreover, this is a § 1983 lawsuit, which means that Jones necessarily is not challenging the validity of his sentence (otherwise, he would be raising a successive habeas claim). If Jones dies, his sentence has simply been fulfilled. *Woodard*, 523 U.S. at 283 ("A denial of

clemency merely means that the inmate must serve the sentence originally imposed."). At most, Jones loses an unlikely and unilateral hope for grace.

### D. The State and the public have a strong interest in seeing the state court judgment carried out.

The State, as well as the public, has a strong interest in carrying out Jones's sentence. *See Hill*, 547 U.S. at 584. The public's interest lies in executing sentences duly assessed, and for which years of judicial review have failed to find reversible error. Indeed, in the twenty-two years since this crime was committed, Jones has passed through the state and federal collateral review process. The public's interest is not advanced by postponing Jones's execution any further, and the State opposes any action that would cause further delay. *Martel v. Clair*, 565 U.S. 648, 662 (2012) ("Protecting against abusive delay *is* an interest of justice.") (emphasis in original).

Again, it is no secret that "capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of a sentence of death." *Rhines*, 544 U.S. at 277–78. Moreover, "[t]he federal courts can and should protect States from dilatory or speculative suits[.]" *Hill*, 547 U.S. 585. Jones offers no evidence of racial animus from any member of the board and can only speculate that their decision to deny relief stemmed from his race. This "speculative suit" is precisely the sort of "dilatory tactic" that the Supreme Court has commanded this Court not to entertain.

28

## CONCLUSION

For the foregoing reasons, the Defendants ask that the Court deny Jones's motion for a stay of execution.

Respectfully submitted,


KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Cara Hanna
CARA HANNA
Assistant Attorney General
Texas Bar No. 24055622
        *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email: cara.hanna@oag.texas.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I do hereby certify that on May 19, 2021, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Michael Mowla
PO Box 868
Cedar Hill, TX 75106
michael@mowlalaw.com

s/ Cara Hanna
CARA HANNA
Assistant Attorney General